Nathaniel Kelly, Esq., SBN 262016
LAW OFFICES OF NATE KELLY
388 Market Street, Suite 1300
San Franscisco, CA 94111
Telephone:  (415) 336-3001
Email:      esquire@natekelly.com

Attorneys for Plaintiff Liron Shapira

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LIRON SHAPIRA, an individual** | ) Civil Action No. |
| **PLAINTIFF,** | ) |
| **v.** | ) **COMPLAINT FOR:** |
| **MICHAL POSPIESZALSKI; an individual, ICHIRO AOKI, an individual; MEHOW PUBLISHING, INC.; MEHOW, INC.; and DOES 1 through 25, inclusive,** | ) 1)  **ACCOUNTING** <br> ) 2)  **VIOLATION OF THE SECURITES ACTS OF 1933 (Section 10(b)) AND 1934 (Rule 10b-5)** <br> ) 3)  **BREACH OF FIDUCIARY DUTY** |
| **DEFENDANTS.** | ) 4)  **VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTION 25401** <br> ) 5)  **MONEY HAD AND RECEIVED** <br> ) 6)  **FRAUD** <br> ) 7)  **UNJUST ENRICHMENT** |
| | ) **and** |
| | ) **DEMAND FOR JURY TRIAL** |

**Verified Complaint for Declaratory and Injunctive Relief**

**(INJUNCTIVE RELIEF SOUGHT)**

-1-

**NATURE AND SUMMARY OF THE ACTION**

1.     This is an action brought by PLAINTIFF LIRON SHAPIRA ("SHAPIRA" or "PLAINTIFF") seeking monetary damages and injunctive relief against MICHAL POSPIESZALSKI ("MEHOW"), an individual, ICHIRO AOKI ("AOKI"), an individual; MEHOW PUBLISHING, INC. ("MPI"); MEHOW, INC.; and DOES 1 through 25 (collectively, "DEFENDANTS") in connection with DEFENDANTS' wrongful attempt to take control of PLAINTIFF'S assets. PLAINTIFFS and DEFENDANTS together are referred to herein as ("THE PARTIES").

2.     DEFENDANTS' wrongful acts include, without limitation, fraud, violations of California and Federal Securities laws, breach of fiduciary duty, and unjust enrichment.

3.     DEFENDANTS began their wrongdoing on around April 2015, when after MEHOW and AOKI had befriended PLAINTIFF, they asked him to provide money to their startup, MPI.

4.     Despite the fact that MPI had weak financials, a struggling product, substantial debt and no business plan, DEFENDANTS informed PLAINTIFF that MPI was worth $10,000,000.

5.     This is despite the fact that MEHOW and AOKI had only recently agreed upon themselves that the valuation was no more than $2,500,000 and the company owed MEHOW more than $1,000,000.

6.     PLAINTIFF, out of his good nature and naiveté, agreed to invest $100,000 at a $10,000,000 valuation and began providing funds to DEFENDANTS on or around April 27, 2015.

7.     DEFENDANTS asked PLAINTIFF for additional funds, which he was promised would be returned to him in short order, and he began providing such short term loans without a written agreement starting in June 2015.

8.     Starting in June 2015 and continuing until January 2016 (before hiring an attorney), Plaintiff made 24 short term loans to DEFENDANTS via wire transfer, with an average of approximately $14,000 per transfer.

-2-

9.     Each time, DEFENDANTS promised PLAINTIFF that he would be repaid in short order, which, of course, did not happen.

## JURISDICTION AND VENUE

10.   PLAINTIFF brings their Complaint under Federal Question Jurisdiction under the Securities Acts of 1933 and 1934.

11.   Venue is proper in this Court pursuant to 28 U.S.C. because a substantial part of the events and omissions giving rise to the claims herein occurred, and a substantial part of the property that is he subject of this action is situated, in this District. Among other things, DEFENDANTS undertook their actions, knowing, and with the intention that, they would damage PLAINTIFF in this District.

## THE PARTIES

12.   Plaintiff, LIRON SHAPIRA, is an individual residing in Mountain View, California.

13.   Defendant MPI, is a corporation existing under the laws of the State of California, United States, having its principal place of business in West Hollywood, CA.

14.   Defendant MEHOW, is an individual residing, at all relevant time in this action, in West Hollywood, California (and who goes by the name, MEHOW).

15.   Defendant AOKI is an individual residing, at all relevant time in this action, in the state of California.

## FACTUAL BACKGROUND

16.   Defendant MEHOW is somewhat well known nationally, and even internationally, especially in the dating advice world, as a "pick up artist" or "pua".

17.   For a number of years, he has provided paid dating advice to interested persons in the form of "residential training programs", starting primarily with men. He has promoted his services primarily through online advertisements.

18.   PLAINTIFF met defendant MEHOW during the first part of 2015, seeking such advice.

19.   On or around April 25, 2015, after a period of months during which MEHOW trained Mr. SHAPIRA to be more confident and successful in dating, MEHOW solicited Mr. SHAPIRA to

-3-

invest in his company, MPI. During this meeting MEHOW showed Plaintiff some revenue "funnels" and stated that the company's value was $10m, at which point Plaintiff verbally agreed to "invest".

20.     MEHOW has written books and produced DVD's about dating, which he sells through various websites. Among the products sold though his sites are the "How to Talk to Hot Women" audio set, a DVD set called "Infield Exposed", and the combined book and audio sets: "Get the Girl!" and "Group Attraction Manifesto" Volumes 1 and 2 (all copyright Mehow, Inc.) Mehow Inc. also offers a variety of boot camps, workshops, and other training opportunities, including a seduction instructor-training program.

21.     In the last five years, MEHOW began offering advice to women as well.

22.     Since, he has written and produced "How to Talk to Hot Guys: The 9 Secrets to Getting and Keeping the Guy of Your Dreams" by Mehow (September 09,2014).

23.     And in the last several years, MEHOW has produced two seasons of a show for Yahoo called The Girls Game, which showed MEHOW teaching girls how to approach guys to get dates and what to do on their dates.

24.     MEHOW pitched PLAINTIFF on the economic opportunities of MPI, which he claimed was the company owning and profiting from sales of his advice, books, and television opportunities; showing him "funnels" of revenue to the company, referring to direct marketing ad campaigns running on Yahoo Gemini that led readers of web content to click through to purchase MPI's info products.

25.     Specifically, MEHOW represented the funnels to PLAINTIFF as successful and high potential, even claiming he had "got them up to $3k/day revenue".

26.     This was, now discovered, a gross and obvious overrepresentation of the real amount, ~$500/day, and even that amount only lasted for ~3 days before being shut down by Yahoo.

27.     Further discussions re the investment continued but formal investment documents were not exchanged, and since, only some financials, a TV Infomercial "one sheet" (actually a couple pages), and a proposed convertible note document have been provided.

-4-

28.   On April 26, 2015, MEHOW, with AOKI, cc'd, sent an email offer to PLAINTIFF, stating:

Upon receiving $100,000 at the wire info below, Mehow Publishing, Inc. shall issue a convertible note for 167 shares of Mehow Publishing, Inc. stock to Liron Shapira. At this time there are 16,511 shares outstanding. The shares shall have a 1x non participating liquidation preference.

29.   On April 27, PLAINTIFF wired $100,000 to DEFENDANTS.

30.   On 2015 May 31, MEHOW asked for more money. Writing, via email:

31.   [I need your help to] get us $20k.  we need a bit of extra float/buffer to get the time to get call center up.  i can offer you a convertible note at the $100k/point valuation for 0.2% of stock or a short term note with some interest repaid by august 1st or some  combination of both.  we could get by with $10k but i start to freak out when there isn't at least 2-4 weeks of runway in the bank.

32.   PLAINTIFF sent an additional $20,000 to DEFENDANTS expecting a short-term payback.

33.   From there until February 2016, followed numerous wires, totaling $471,500 based on promises of short-term repayment for the more than $370,000 provided and great ROI on the $100,000 "invested", all without proper and or comprehensive documentation.

34.   What PLAINTIFF did not know at the time but has since learned, is that just a few months earlier, DEFENDANTS had agreed that the value of MPI was only $2,500,000.

35.   Furthermore, DEFENDANTS did not disclose that MPI had entered into loan agreements with MEHOW and AOKI for upwards of $2,000,000.

36.   DEFENDANTS represented MPI as being a company in good legal standing, but actually they have been under Investigation by the IRS and the extent of MPI's and/or MEHOWs tax debt is unknown.

37.    Moreover, PLAINTIFF has learned from accounting statements received months after his initial investment, there are additional items on the balance sheet, such as a debt to MEHOW's previous company (a teeth-whitening product), which was also not previously disclosed.

38.    PLAINTIFF has attempted to address these disclosures but has been told by MEHOW and AOKI that he "should have asked more questions".

39.    On or around June 2015, MEHOW pitched PLAINTIFF the idea of renting an expensive house in West Hollywood (between $10-13k a month), stating that a nicer house helps attract students who want to be coached.

40.    2015 Jun 25: PLAINTIFF signed rental agreement for MPI's house.

41.    The deposit was $25,000. The same day PLAINTIFF signed the rental agreement, he wired $30k to MPI with the memo "Convertible note 325001349393", without further documentation. PLAINTIFF was also asked and did wire money to pay for furnishing the house.

42.    In July 2015, PLAINTIFF helped produce an infomercial for MPI designed to sell MPI's products (but which PLAINTIFF was also told would result in purchases of residential training.

43.    The infomercial final cut is available online at Youtube.com/watch?v=hWvC5gw2DZc.

44.    Once again, however, PLAINTIFF was mislead about the purpose and or financial benefits of this endeavor, as, despite the infomercial being well received in testing, DEFENDANTS either did not have or did not intend to spend the amount of money necessary to make the infomercials a profitable venture, instead, asking PLAINTIFF for more and more money and stating that a Venture Capital investment round was necessary. (Neither of which were disclosed to PLAINTIFF prior to his provision of money for the production.)

45.    The problem is, DEFENDANTS did not intend and did not in fact use the house to increase revenues from the "residential coaching business".

46.    DEFENDANTs merely wanted to live in luxury and use the house for their personal pleasures.

47.    And, within three months, DEFENDANTS turned their attention to producing a new online television spot.

-6-

48.    On or around October 2015, MPI was given the opportunity to produce a $750k TV production deal with Yahoo, Inc. and the PARTIES began planning on how best to capitalize.

49.    And on or around 2015 Oct 27, MEHOW and PLAINTIFF came up with an idea for a "Mr. Right" website that would be tied into the Yahoo TV show; and came up with the idea of what would become MrRight.net.

50.    The TV show was to and does have a branded tie-in to the site (same name, same logo, and various other references / product placements).

51.    PLAINTIFF singlehandedly created MrRight.net, designing all pages and writing over 10,000 lines of software code. PLAINTIFF, on DEFENDANTS' behest, paid over $4,000 out-of-pocket to work with various design professionals for web designs and graphics used on MrRight.net.

52.    PLAINTIFF was promised that he would be reimbursed all out of pocket expenses and compensation for his services would be finalized.

53.    PLAINTIFF was also in charge of MPI's company rebranding, which would involve changing the company brand to "Positive Relating" and transitioning from a "Pickup Artist" brand to  a mainstream dating brand.

54.    PLAINTIFF, on DEFENDANTS behest, paid over $1,000 out-of-pocket to work with various design professionals and create logos and site designs for MPI's rebranding PLAINTIFF also singlehandedly created MPI's new website at PositiveRelating.net.

55.    MPI has yet to reimburse PLAINTIFF for any expenses related to the rebranding, despite agreeing to do so on multiple occasions, and despite using the work in various ways, e.g. the "Mr. Right" TV show on Yahoo uses the logo that PLAINTIFF paid for out-of-pocket.

56.    2015 Dec 23: MPI received official $750k purchase order paperwork from Yahoo.

57.    Receiving this meant that in 1-2 weeks, MPI would be receiving its first $375k payment from Yahoo.

58.     In January, when PLAINTIFF approached DEFENDANTS about receiving repayment for his short term loans and or compensation for his creation of the Mr. Right website, MEHOW informed him that DEFENDANTS "decided [they are] gonna pay [him] a $200k bonus as "back pay" out of the VC funding [talking about raising VC money for MrRight.net] or revenue.

59.     PLAINTIFF, however, has since been repaid only $49,000, leaving $422,500 remaining received but unreturned by DEFENDANTS with no reasonable belief or expectation of repayment.

60.     DEFENDANTS proposed a convertible note to PLAINTIFF on or around July 07, 2015, which was rejected by PLAINTIFF due to questions about the company.

61.     PLAINTIFF had a number of material concerns about the business of MPI, including but not limited to the fact that an official (finalized) Company business plan did not and still does not currently exist.

62.     PLAINTIFF made several requests for documentation and to improve the professionalism of the business to enable him to invest.

63.     PLAINTIFF has requested documents, including but not limited to:

    a.  Documents clarifying ownership and relationship between Mehow Publishing Inc., Mehow Inc., and "The Residential, LLC". Specifically, documents indicating whether any revenue, cost, or profit sharing agreements exist or if any entities own stock in (or have loans with) the others;

    b.  A formal business plan for MPI showing current accounting (2015 to 2016) and revenue models for next two to three years justifying a valuation (10M or whatever). Specifically, revenue projections as well as explicitly separating accounting of MPI's business expenses from accounting of MEHOW's personal compensation;

    c.  Documents showing MPI has license to MEHOW's name, likeness and any non-compete agreements (or if MEHOW is free to start and pursue another competing company using is fame and skills as a PUA); and

-8-

d.  Most recent investment terms and documents, including relevant accounting.

64.     MEHOW, on behalf of DEFENDANTS, has stated that: he is "100% tied to the company," there is "no such thing" as Mehow Realty", and MPI and Mehow Inc. are the same entity. Nonetheless, on Tuesday, March 8, 2016, MEHOW admits that all revenues from MPI's Yahoo online TV shows, "The Girls Game" and "Mr. Right", are directed to "The Residential, LLC".

65.     The facts, however, indicate that agreements re MPI's right to use MEHOW's name and likeness have not been finalized.

66.     PLAINTIFF has made demand for return in full of the outstanding monies received by DEFENDANTS.

67.     DEFENDANTS have, explicitly, promised to return the $429,000 balance but have been unwilling to agree to reasonable terms.

68.     2016 Jan 4: MPI receives first $375k from Yahoo in $750k TV production deal.

69.     MEHOW's own records show where the money went ("yahoo cash plan" sheet, "1st payment" column): i) Paid Lior (third party) $24k; ii) Paid PLAINTIFF $45k; iii) Paid AOKI $110k; Paid MEHOW $60k.

70.     PLAINTIFF never had a chance to weigh in on whether he thought $45k was a fair amount to get paid back - he didn't – or whether the other payments were appropriate.

71.     MEHOW immediately spent much of the money to finance his personal lifestyle, including making a down payment on his custom-modified Jeep Rubicon valued at approximately $80,000 (after modifications). He also purchased a $10,000 turntable for his bedroom.

72.     In an email, MEHOW wrote: "p.s. Ichiro out of my money im planning on kicking in $20k for the jeep to cover downpayment and the payments for the first year. I can commit to that."

73.     Even if one were to ignore that financing MEHOW's lifestyle was inappropriately benefiting himself over properly repaying amounts owed to PLAINTIFF, MEHOW also

-9-

explicitly states in the "burn rate" spreadsheet that he's also holding off payments to his key employees/contractors.

74.    MEHOW and AOKI entered into private agreements to, and did, indebt MPI to themselves and to take all non-essential revenue from the Yahoo TV deal for themselves.

75.    Further, MEHOW and AOKI failed to consider reasonable plans to reduce business expenses in order to enable MPI profitability.

76.    In early Feb 2016, AOKI made a personal loan to MPI, in an amount of over $10k, because MPI failed to budget enough to pay rent. This shows that DEFENDANTS did not make a serious effort at budgeting when MEHOW paid himself an unreasonable sum in order to buy a car and turntable.

77.    MEHOW and AOKI used PLAINTIFF's money to line their own pockets. Below are some of the items MEHOW spent PLAINTIFF's money on, all purchased in 2015, with direct approval of AOKI but without consent from PLAINTFF. All items are non-essential unnecessary for the business of MPI.

     a.   House: Rents a beautiful new $12.5k/month house in West Hollywood; Huge luxury master bedroom for himself; Custom-built track lighting and high end furniture.

     b.   Car: $80,000 new custom Jeep Rubicon; ~$40k down payment and financing at $800/month.



-10-

c. <u>High-end music equipment</u>: $10,000 turntable; $4,000 guitar; $2,500 guitar amplifier; $3,500 for "sound healing instruments".

d. <u>Lifestyle</u>: $1,500/month personal chef; $1,000/month in supplements including testosterone and HGH; $800/month hair treatments; $200/month membership to Equinox gym; $250/mo personal training; $300/mo cryonic therapy membership; $2,000 for a January ski trip to Mammoth.

e. <u>Womanizing</u>: $4,500 for 3 months of rent for girlfriend Lucinda Diaz; $4,500 paid to a friend of Lucinda Diaz for Tantric sex classes; Has paid for multiple dates through the website WhatsYourPrice.com, paying $150 to the woman on each date.

f. <u>Additional non-business costs, which are expensed to company</u>: $100s/month in personal groceries; $100s/month in personal restaurant meals, including dinner dates, expensed to the company; $100s/month in personal Uber and Lyft rides expensed to the company; $100s/month in gas for his car expensed to the company; Chiropractor - $340 on 09-17, $560 on 10-29, $260 on 12-08; MPI pays Mehow's personal Netflix account.

g. <u>Paying down personal debts</u>: $500/mo payment to a pawn shop that is holding $25,000 of his guns; $3,700/month to the IRS.

h. <u>Treating a friend</u>: For the last 8 months, MPI has paid for Daniel Crosser to live in one of the 3 bedrooms of a $12.5k/month house and over $3k/month additional pay; Crosser's only documented work output during this period is a rough 120-page manuscript which was never edited or planned for any kind of product release.

78. The estimated total value of MEHOW's 2015 personal spending is over $120k, which is equivalent to receiving a $180k yearly salary after-tax and spending it all.

79.   MPI's accounting documents do not account for MEHOW's aggregate personal spending amount. Instead, they show that MPI is indebted to MEHOW an additional amount of over $100k/year for "forgoing salary".

80.   Furthermore, every time MPI receives money in any form, MEHOW and AOKI pay themselves, while the business is constantly in near-bankruptcy, including but not limited to:

    a.   [2015-10] $40k from a deal with SJA call center; MEHOW wired himself $8k shortly after (nothing to PLAINTIFF);

    b.   [2015-12] $375k from Yahoo; MEHOW wired $110k to AOKI and $60k to himself (plus $45k to PLAINTIFF);

    c.   [2016-03] $178k from Yahoo; MEHOW wired $51k to AOKI and took $20k+ for himself (nothing to PLAINTIFF)

81.   On or around March 4, 2016, when DEFENDANTS received $178,000 in revenue, the only offer to pay PLAINTIFF was in the amount of $10,000, which was then revoked by DEFENDANTS.

82.   PLAINTIFF then requested to be repaid expenses for the Positive Relating rebranding and the MrRight.net site but was also declined.

83.   MEHOW and AOKI, without including PLAINTIFF in the discussion (despite previously agreeing to do so for all major business decisions) agreed between themselves to pay each other directly at least $75,000 out of the $178,000 in revenue, instead of using it for repayment of PLAINTIFF or actual business expenses.

84.   PLAINTIFF explicitly objected to DEFENDANTS' receipt of this personal benefit and asked the money to be placed in escrow and only monies necessary for the business be used.

85.   Based on information and belief, MEHOW and AOKI have already distributed this revenue to themselves.

**FIRST CLAIM FOR RELIEF**
**For an Accounting**
**(Against All Defendants)**

-12-

86.   PLAINTIFF realleges and incorporates by reference the information and allegations set forth above in paragraphs 1-  85 .

87.   As a result of the aforementioned receipt of PLAINTIFF'S money without agreement, this money is due back from DEFENDANTS.

88.   PLAINTIFF has demanded an accounting of MPI but DEFENDANTS have failed and refused, and continue to fail and refuse, to render such an accounting and to pay sums owed.

89.   WHEREFORE, PLAINTIFF seeks judgment against defendants for a full accounting, to be provided within 30 days of the entry of judgment, and such other relief as the Court deems fair and equitable.

### SECOND CLAIM FOR RELIEF
**Violation of the Securities Act of 1933 and the Securities Exchange Act of 1934
(As to all Defendants)**

90.   PLAINTIFF hereby incorporates paragraphs 1-  89 as set forth herein.

91.   Securities sold in the United States that are not registered with the Securities and Exchange Commission "SEC") under Regulation D must conform to the provisions of SEC Regulation D ("Reg. "D").

92.   Reg. D Rule 502 states that unregistered securities must be preceded by disclosures that approximate those which would be disclosed in a formal registration.

93.   Prior to receiving PLAINTIFF'S monies, DEFENDANTS disseminated or approved the false statements specified above, including but not limited to DEFENDANTS' statements on April 26 and 27, 2015, in person and via email, that MPI had stock with a value reasonably approximating $10,000,000.

94.   DEFENDANTS, however, failed to disclose that: i) a formal business plan did not exist; ii) the company had recently been valued at $2,500,000 without any positive material changes occurring that would justify such a dramatic valuation increase; iii) that MPI was indebted to MEHOW and AOKI (its two principle shareholders) in excess of $2,000,000; iv) MPI was indebted to MEHOW's prior company (which produced a teeth whitening product; and v) MPI

had been under Investigation by the IRS with the extent of MPI's and/or MEHOW's tax debt being unknown.

95.   When PLAINTIFF confronted Defendants MEHOW and AOKI regarding their non-disclosure of the loans, both stated it was PLAINTIFF's fault for not asking about the loans; buyer beware.

96.   DEFENDANTS made these statements, which they knew or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

     a.    Employed devices, schemes and artifices to defraud;

     b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; or

     c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of MPI securities.

98.   The false, deceptive, and misleading statements and omissions were made with knowledge that PLAINTIFF was exceedingly unlikely to receive any profits from the Company but with the knowledge and intention that PLAINTIFF rely on these statements and furnish DEFENDANTs with monies based on these misstatements.

99.   MEHOW and AOKI had every reason to know that the MPI business was not an investible opportunity. Even though MEHOW personally may have the know-how and fame to make a decent living selling his advice or appearing in online television shows, he has never made more than what would be considered a mid-level entertainment salary. His sole intention of accepting investment was to improve his own personal lifestyle and compensation.

100. AOKI was aware of MEHOW's business practices and was also using MPI and MEHOW to improve his personal lifestyle, especially in the area of dating and partying – essentially using company funds to pick up girls. AOKI has had significant relationship with three women from November 2015 to March 2016, all of which were introduced to him via MEHOW and MPI. (It is worth remembering that getting girls is the original, and still primary, reason, for AOKI's involvement.)

101. The aforementioned acts were undertaken in violation of Section 12(a) of the Securities Act of 1933, section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 adopted pursuant thereto.

102. But for DEFENDANTS' misstatements and omissions, PLAINTIFF would not have provided funds to DEFENDANTS.

103. PLAINTIFF has suffered damages in that, in reliance on the statements and omissions by DEFENDANTS, he paid an artificially inflated price for MPI securities and provided short-term loans that were and are very unlikely to get paid back in full. PLAINTIFF would not have purchased the MPI securities at the price he paid, or at all, if he had been aware that the sale price had been artificially and falsely inflated by DEFENDANTS' misleading statements.

**THIRD CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(As to Defendants MEHOW AND AOKI)**

104. PLAINTIFF hereby incorporates paragraphs 1 through 103 as though set forth herein.

105. The agreements entered into by the Parties, whereby DEFENDANTS received PLAINTIFF's monies with a promise to return on demand or upon other written agreement, created a fiduciary duty that required, without limitation, the duties of care, loyalty, and full disclosure of all material facts that would affect PLAINTIFF's decision to enter into and or continue a contractual relationship with DEFENDANT.

106. At all times relevant herein, MEHOW and AOKI breached their fiduciary duty to PLAINTIFF by entering into agreements without consulting or receiving consent from

-15-

PLAINTIFF that amounts to self-dealing, siphoning money from MPI to their personal benefit, refusing to pay expenses incurred on behalf of MPI, and by failing to distribute profits as earned.

107. As a result of the aforementioned breaches of fiduciary duty, PLAINTIFF has suffered and continues to suffer damages in an amount to be established at trial.

## FOURTH CLAIM FOR RELIEF
### Misrepresentations or Omissions of Material Facts
### in Violation of California Corporations Code Section 25401
### (As to Defendants MEHOW and AOKI)

108. PLAINTIFF realleges and incorporates by reference paragraphs 1 through 107 of this Complaint as though fully set forth herein.

109. California Corporations Code section 25401 provides as follows:

It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110. Commencing at least as early as April 2015, MEHOW and AOKI, offered and or sold, securities in issuer transactions in the state of California. Specifically, on April 26 and May 31, 2015, DEFENDANTs offered and did sell securities in the form of convertible notes documented via email. Convertible notes (although without specific terms) were offered and or sold on numerous occasions, as detailed above.

111. The investments offered and or sold by MEHOW and AOKI, are "securities" within the meaning of California Corporations Code section 25019. The securities included, but are not limited to, stock and convertible debt in MPI.

112. The sale referred to herein, were "issuer transactions" within the meaning of sections 25010 and 25011 of the California Corporations Code.

113. MEHOW and AOKI "offered and sold" the securities referred to herein in the state of California within the meaning of California Corporations Code sections 25008 and 25017.

114. In offering, selling, and purchasing the securities referred to herein, DEFENDANTS made untrue statements and or misrepresentations of material facts to PLAINTIFF. The

-16-

misrepresentations of material facts included, without necessarily being limited to: i) MPI had a reasonable valuation of $10,000,000; ii) MPI had a formal business plan that, if followed, was likely to result in significant profits for MPI; and iii) DEFENDANTS represented MPI as being a company in good legal standing.

115. In offering, selling, and purchasing the securities referred herein, MEHOW and AOKI also omitted to state material facts to PLAINTIFF. The omissions included, but without necessarily being limited to: i) a formal business plan did not exist; ii) the company had recently been valued at $2,500,000 without any positive material changes occurring that would justify such a dramatic valuation increase; iii) that MPI was indebted to MEHOW and AOKI (its two principle shareholders) in excess of $2,000,000; iv) MPI was indebted to MEHOW's prior company (which produced a teeth whitening product; and v) MPI had been under Investigation by the IRS and that the extent of MPI's and/or MEHOW's tax debt was unknown.

116. They also omitted that MEHOW and AOKI, had no intention or plan to increase the value of the MPI stock, merely intending to line their pockets with MPI revenue.

117. The misstatements and omissions referred to herein were of "material facts" within the meaning of California Corporations Code section 25401.

118. MEHOW and AOKI made untrue statements and or omitted to disclose statements of material facts in connection with the offer and sale of securities in violation of California Corporations Code 25401.

119. PLAINTIFF was significantly damaged in that he would have never provided DEFENDANTS with an excess of $400,000 had he been told the truth, although the full damages are to be proven at trial.

### FIFTH CLAIM FOR RELIEF
**For Money Had and Received**
**(As to All Defendants)**

120. PLAINTIFF hereby incorporates paragraphs 1 through 119 as though set forth herein.

121. Within the past two years, DEFENDANTS, and each of them, became indebted to

-17-

PLAINTIFF in an amount greater than $400,000, for money had and received for the use and benefit of PLAINTIFF.

122. Only $49,000 of such sum has been paid, although demand for payment in full has been made and there is now due, owing, and unpaid, the sum of greater than $400,000 with interest at the rate of 10% per annum from April 2015 and thereafter.

WHEREFORE, Plaintiffs asks that this Court issue a judgment for the damages suffered in the amount of $500,000, inclusive of statutory interest, as well as legal fees and costs.

### SIXTH CLAIM FOR RELIEF
### For Fraud
### (As to Defendants MEHOW and AOKI)

123. PLAINTIFF refers to and incorporates herein by this reference, all of the allegations contained in paragraphs 1- 122 of this Complaint.

124. The facts show that MEHOW and AOKI have been engaged in an ongoing scheme to defraud PLAINTIFF since at least April 2015, to the present.

125. PLAINTIFF placed great trust in MEHOW and AOKI at all times relevant in this matter, including but not limited to, the conversations that took place regarding MPI's ability to grow into a wildly profitable business.

126. On multiple occasions, including in person on April 25, 2015, and later on numerous occasions, by telephone and email, MEHOW represented to PLAINTIFF that MPI had the ability for substantial profitability. Specifically, MEHOW stated that, based on MPI's progress, he and MPI's investors believed a fair valuation was $10M.

127. AOKI explicitly supported the $10M valuation on April 25, 2015 before a celebratory dinner (and prior to PLAINTIFF wiring any money).

128. MEHOW and AOKI, however, purposely omitted certain key information that would bring the $10M valuation into question.

129. They did not disclose that just months earlier, they had agreed together that the company was actually worth only $2.5M.

-18-

130. They did not disclose that MPI had entered into loan agreements with MEHOW and AOKI for upwards of $2,000,000.

131. DEFENDANTS represented MPI as being a company in good legal standing, but did not disclose they had been under Investigation by the IRS or that the extent of MPI's and/or MEHOW's tax debt is unknown.

132. Moreover, MEHOW and AOKI omitted that there are additional items on the balance sheet, such as a debt to MEHOW's previous company (a teeth-whitening product).

133. MEHOW and AOKI made these false statements and material omissions knowing that by doing so they would make PLAINTIFF more likely to provide money to and or invest in MPI. And the purpose of these material misstatements was to deceive PLAINTIFF about the appropriate valuation of MPI.

134. MEHOW and AOKI have admitted that they were aware that PLAINTIFF would have benefited from this info and yet purposely did not disclose, simply because PLAINTIFF "did not ask".

135. MEHOW and AOKI made these false statements intending that they be relied upon, first for the purpose of obtaining thousands of hours of essentially free design, branding, and website software engineering help from PLAINTIFF, and also for the purpose of personally enriching themselves.

136. MEHOW and AOKI, as as the management and principle shareholders of MPI, knew MPI was not as strongly positioned as had been represented, but chose to exaggerate MPI's position and potential in order to induce PLANTIFF to support MPI and turn control of his funds over to them.

137. After gaining control of such funds, MEHOW and AOKI were free to, and in fact did, divert accounts receivable into their personal coffers, including and especially through the Yahoo monies received in December 2015 and March 2016.

138. While MEHOW and AOKI have enriched themselves, PLAINTIFF has spent significant time and expertise building a dating website platform for MPI.

139. PLAINTIFF has been damaged in an amount to be proved at trial.

### SEVENTH CLAIM FOR RELIEF
**For Unjust Enrichment**
**(Against All Defendants)**

140. PLAINTIFFS refer to and incorporate herein by this reference, all of the allegations contained in paragraphs 1- 139 of this Complaint.

141. By reason of DEFENDANTS' wrongful conduct alleged herein, DEFENDANTS have been unjustly enriched by utilizing funds that rightfully belonged to PLAINTIFF for their personal expenses, lifestyle, and promotion, and have profited thereby.

142. In addition, PLAINTIFF provided considerable value to DEFENDANTS, at the request of DEFENDANTS, by updating MPI's software platform and designing and building a dating website. Such work entailed a precise market value to be proven at trial but in any case for no less than $100,000.

143. Meanwhile, despite promises to compensate PLAINTIFF and or return his funds, DEFENDANTS have not done so.

144. As a direct and proximate result of their wrongful conduct, the DEFENDANTS, as alleged hereinabove and as may be shown at trial in this action, have enriched themselves in an amount not presently ascertained with certainty but which is in an amount not less than $400,000 above and beyond any value provided to PLAINTIFF.

145. As such, these wrongful profits by DEFENDANTS should be discharged to PLAINTIFF as a matter of equity.

//
//
//
//
//
//

-20-

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.  Awarding Plaintiffs' damages, including interest;

B.  Awarding Plaintiffs reasonable costs and attorneys' fees;

C.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**Respectfully submitted,**

March 12, 2016                **LAW OFFICES OF NATHANIEL KELLY**

By:___*Nate Kelly*_____
    Nathaniel G. Kelly

Law Offices of Nate Kelly
388 Market Street, Suite 1300
San Francisco, CA 94111
(415) 336-3001
Esquire@natekelly.com

Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated:   March 12, 2016        **LAW OFFICES OF NATHANIEL KELLY**

By:___*Nate Kelly*_____
    Nathaniel G. Kelly

Law Offices of Nate Kelly
388 Market Street, Suite 1300
San Francisco, CA 94111
(415) 336-3001
Esquire@natekelly.com

Attorneys for Plaintiff

-21-

**VERIFICATION**

1

2        I SWEAR (OR AFFIRM) UNDER THE PENALITIES FOR PURJURY UNDER THE
LAWS OF THE UNITED STATES THAT THE FOREGOING STATEMENTS
CONCERNING MEHOW PUBLISHING, INC., MEHOW INC., MICHAL POSPIESZALSKI,
3   AND ICHIRO AOKI ARE TRUE AND CORRECT TO THE BEST OF KNOWLEDGE AND
UNDERSTANDING.

4

Dated: this 12th[th] day of March, 2016.

5

6   

7   Liron Shapira

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR ACCOUNTING, SECURITIES VIOLATIONS, BREACH OF FIDUCIARY DUTY, ETC.**